

FILED

JUN 25 2004

CLERK, US DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

KARLUK M. MAYWEATHERS;
DIETRICH J. PENNINGTON;
JESUS JIHAD; TERRANCE MATHEWS;
ASWAD JACKSON; ANSAR KEES,
individually and on behalf of
all others similarly situated,

NO. CIV. S-96-1582 LKK/GGH P

     Plaintiff,

   v.

                      O R D E R

CALVIN TERHUNE; A.C. NEWLAND;
BARRY SMITH; BONNIE GARIBAY;
N. FRY; M.E. VALDEZ; N. BENNETT;
and F.X. CHAVEZ,

     Defendants.
_____/

    This matter comes before the court on plaintiffs' motion

for summary judgment and for a permanent injunction.  I decide

the motion on the basis of the papers and pleadings filed herein

and after oral argument.

////

////

# I.

## BACKGROUND

Plaintiffs are a class of Muslim state prisoners housed at California State Prison-Solano seeking relief under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et* *seq.*, and under 42 U.S.C. § 1983, for alleged violations of their First Amendment right to the free exercise of their religion, as well as their Fourteenth Amendment right to equal protection of the law.

Each of plaintiffs' alleged violations has either been addressed by a settlement agreement between the parties or is subject to a preliminary injunction that has been continued by stipulation pending the ruling on the instant motion. The present motion seeks to make the stipulated injunctive relief permanent.

This court has issued fifteen preliminary injunctions in this case since July 31, 2001, with defendants unsuccessfully appealing all but one. Following the Ninth Circuit's decision to uphold RLUIPA and the Supreme Court's denial of defendants' petition for *certiorari*, the parties stipulated to the continued operation of the previously-ordered injunctive relief pending a final decision by this court. The relevant facts in this case have remained essentially unchanged throughout the course of this litigation and are set forth in detail in the previous orders of this court and the Ninth Circuit.

////

///

1 **A.    PROCEDURAL HISTORY**

2      Several individual and group complaints were filed by the
3 Muslim inmates at California State Prison at Solano in 1995 and
4 1996.   On October 16, 1997, the court appointed counsel for the
5 plaintiffs.   The actions were consolidated and a class action was
6 certified on November 19, 1998.

7      Originally, plaintiffs sought relief with respect to several
8 claims reflecting a variety of requests for accommodation of the
9 plaintiffs' practice of Islam.   An order filed on June 5, 2000,
10 memorialized and confirmed settlement agreements reached on all
11 issues except plaintiffs' request to attend Jumu'ah services and
12 to wear half-inch beards without being disciplined or subjected to
13 the loss of any sentence-reducing ("work time" or "good time")
14 credits to which they may otherwise be entitled.

15      Plaintiffs' claims of violation of their religious freedom
16 originally proceeded under the standards set forth in Turner v.
17 Safley, 482 U.S. 78 (1987).   The first three preliminary
18 injunctions, all for Jumu'ah attendance, were granted under the
19 Turner standard and affirmed by the Ninth Circuit.   Mayweathers v.
20 Newland, 258 F.3d 930 (9th Cir. 2001).   Plaintiffs' original motion
21 for preliminary injunction on the grooming issue was denied under
22 the Turner standard.

23      In September 2000, President Clinton signed the RLUIPA into
24 law.   Shortly thereafter, the court granted plaintiffs leave to
25 amend in order to add a RLUIPA claim.   Defendants moved to dismiss
26 the RLUIPA claim, arguing that the statute is unconstitutional.

3

On July 2, 2001, this court found the act to be constitutional and denied defendants' motion to dismiss.

Defendants appealed the order to the Ninth Circuit. As set forth below, defendants also appealed preliminary injunctions four through ten concerning Jumu'ah, and the first four of the five preliminary injunctions concerning grooming. All of those appeals were based only on defendants' challenge to the constitutionality of RLUIPA. Consequently, all were either consolidated with the RLUIPA appeal or were stayed pending the outcome thereof. On December 27, 2002, the Ninth Circuit upheld the constitutionality of RLUIPA and thereby affirmed the preliminary injunctions.[1] Mayweathers v. Newland, 314 F.3d 1062 (9th Cir. 2002). Defendants' petition for rehearing en banc was denied. Defendants then filed a certiorari petition in the Supreme Court, which was also denied. Alameida v. Mayweathers, __ U.S. __, 124 S.Ct. 66 (2003).

**B.    JUMUA'AH ATTENDANCE**

CSP-Solano is a medium security prison about thirty-five miles southwest of Sacramento. The vast majority of inmates are enrolled in the prison's work incentive program, in which every day of participation may reduce their sentences by one day. Under the relevant prison regulations, all able-bodied prisoners, including plaintiffs, are required to work or attend class. Cal. Code Regs., tit. 15, § 3040(a). Plaintiffs' work or class assignments are made

---

[1]    The appeals stayed pending the outcome of the main appeal were subsequently dismissed by the defendants, with no further challenge to the relief granted by this court.

4

1  by prison staff "with or without the inmate's consent." <u>Id.</u> at
2  § 3040(c) & (f).

3       If inmates miss work without the approval of their
4  supervisors, they receive an unexcused absence, known as an "A
5  day," which can be grounds for discipline.  Being late or "absent
6  without authorization from a work or program assignment" is an
7  "administrative rule violation," <u>id.</u>, at § 3314(a)(d)(H), and
8  "[r]efusal to perform work or participate in a program as ordered
9  or assigned" is a "serious rule violation." <u>Id.</u> at
10 § 3315(a)(3)(J).   The punishment for such violations includes
11 suspension of privileges, confinement to quarters, forfeiture of
12 up to thirty days of sentence credits, change in work incentive
13 program eligibility, and transfer to a higher level prison.  <u>Id.</u>
14 at § 3314(e), 3315(f), 3323(h), 3375.

15      According to Muslim scholars and imams who have offered
16 evidence on behalf of the plaintiffs, attendance at the Friday
17 Sabbath services known as Jumu'ah is commanded by the Qur'an, and
18 the services must be held collectively under the leadership of an
19 imam.  <u>See</u> <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 340, 345 (1987)
20 ("Jumu'ah is commanded by the Koran and must be held every Friday
21 after the sun reaches its zenith and before the Asr, or afternoon
22 prayer." ); Hamdani Depo. at 39:8-16.  Plaintiffs assigned to work
23 or class on Friday are not allowed to leave their assignments to
24 attend Jumu'ah.  Cal. Code Regs., tit. 15, § 3041(b).  Plaintiffs
25 who leave their work or class assignments to attend Jumu'ah have
26 been, and without injunctive relief may in the future be, subjected

1  to progressive discipline resulting in the imposition of numerous
2  penalties and loss of privileges.  15 Cal. Code Regs., tit. 15,
3  §§ 3044, 3315(a)(3)(j), 3315(a)(3)(f); Matthews Depo. at 103:4-
4  105:9; Pennington Depo. at 15:6-17; Mayweathers Depo. at 76:9-19.
5  Those plaintiffs who are entitled to earn sentence-reducing credits
6  by working or going to class are denied those credits for each day
7  that they leave for an hour to attend Jumu'ah.  Cal. Code Regs.,
8  tit. 15, § 3045.2; Garner Decl.

9       Plaintiffs' first motion for preliminary injunction concerning
10  Jumu'ah attendance was filed on October 21, 1999.  Plaintiffs
11  requested to be allowed to attend Jumu'ah without being
12  disciplined, which was clarified as including protection from
13  receiving progressive discipline and from denial of sentence-
14  reducing "work time" or "good-time" credits.  By order of July 31,
15  2000, the court adopted the magistrate judge's recommendations and
16  granted the first preliminary injunction concerning Jumu'ah.

17       Every preliminary injunction in this action was subject to the
18  automatic 90-day expiration provision of the Prison Litigation
19  Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(2).  Plaintiffs have
20  therefore filed numerous subsequent motions for identical relief
21  over the course of the litigation.  Defendants' argument that such
22  repeated motions are barred by the PLRA was rejected by this court
23  and affirmed by the Ninth Circuit.  <u>Mayweathers v. Terhune</u>, 136
24  F.Supp.2d 1152 (E.D. Cal. 2001); <u>aff'd</u>, <u>Mayweathers</u>, 258 F.3d at
25  936.
26  ////

1    This court issued a second preliminary injunction on December
2  19, 2000, prohibiting defendants from imposing disciplinary action
3  or the "forfeiture" of work time credits when plaintiffs attend
4  Jumu'ah. After further briefing and additional oral argument, the
5  court denied plaintiffs' request for the relief to be expanded to
6  include prohibiting defendants from denying plaintiffs the
7  opportunity to "earn" work time credits while they attend Jumu'ah.
8  Plaintiffs' third motion for preliminary injunction, still under
9  Turner, was granted March 30, 2001. Defendants appealed each of
10  the first three injunctions regarding Jumu'ah. On August 2, 2001,
11  the Ninth Circuit affirmed each of the injunctions. Mayweathers,
12  258 F.3d 930 (9th Cir. 2001). The fourth motion for preliminary
13  injunction was filed based upon both Turner and RLUIPA and was
14  granted on July 5, 2001. The court expanded the relief and ordered
15  as follows:

16       [P]laintiffs are allowed to attend Jumu'ah services
         during  the  pendency  of  this  action  without
17       receiving disciplinary action, forfeiting good-time
         credits,  or  losing  the  opportunity  to  earn  good-
18       time credits.

19  Order of July 5, 2001.

20    All  subsequent  orders  by  the  court  granted  this  same
21  injunctive relief. The court issued these orders based on the law
22  of the case doctrine, finding that defendants had failed each time
23  to respond to plaintiffs' further Jumu'ah motions with any new
24  evidence or new legal argument that had not already been considered
25  and rejected by the court. Arizona v. California, 460 U.S. 605
26  (1983). Defendants appealed each of the fourth through tenth

preliminary injunctions, challenging the constitutionality of
RLUIPA in each appeal.  All of the appeals were consolidated into
one challenge of RLUIPA and all were denied.  Mayweathers, 314 F.3d
1062.   The Ninth Circuit's decision rejecting some appeals, and
defendants' dismissal of others that had been stayed, resulted in
affirmance of the fourth through tenth preliminary injunctions for
Jumu'ah and the four grooming appeals.

Pending *en banc* review by the Ninth Circuit, and again
following denial or *certiorari* by the Supreme Court, the parties
stipulated to allow the Jumu'ah and grooming injunctive relief to
continue without requiring the court to issue successive renewals
under the PLRA.   Defendants thus forfeited the opportunity to
produce evidence in opposition to the plaintiffs' claims for
injunctive relief.   Thus, pursuant to court order, plaintiffs are
currently being allowed to leave their assignments to attend
Jumu'ah without being disciplined or being denied the opportunity
to earn sentence-reducing credit.

**C.    GROOMING POLICY**

Plaintiffs have also challenged defendants' grooming policy.
Wearing at least a half-inch beard is an exercise of plaintiffs'
religion.   Hamdani Depo. at 69:4-6; Hasan Decl. at ¶¶ 3, 6.   CDC
grooming regulations prohibit plaintiffs from wearing beards of any
length for religious purposes.   Cal. Code Regs., tit. 15,
§ 3062(h).   Plaintiffs have worn beards for religious purposes and
have been, and without injunctive relief may in the future be,
considered "program failures" and have been, and may be, subjected

8

1  to progressive discipline. Cal. Code Regs., tit. 15, § 3062(m);
2  Mayweathers Depo. at 14:3-15:19, 35:6-36:25, 81:7-88; Jihad Depo.
3  at 68:18-69:18; 99:2-100:3.

4      Plaintiffs' original motion for preliminary injunction
5  challenging defendants' grooming regulations was premised on the
6  Turner standard.  The court denied that motion on July 31, 2000.
7  On September 13, 2001, plaintiffs filed a new motion for
8  preliminary injunction to allow them to wear a half-inch beard, but
9  this time they did so under RLUIPA.   That motion was granted on
10 February 8, 2002.  Defendants appealed the injunction, based only
11 on a challenge to the constitutionality of RLUIPA.

12     As with the Jumu'ah issue, plaintiffs filed subsequent motions
13 for preliminary injunction on the grooming issue because each order
14 expired automatically after 90 days.  By order dated April 26,
15 2002, the court denied defendants' motion to stay enforcement of
16 the first grooming injunction and granted plaintiffs' motion to
17 renew the injunctive relief.  Defendants appealed the second
18 injunction, again challenging only the constitutionality of RLUIPA.
19 Defendants appealed the third and fourth injunctions.  The fifth
20 grooming injunction was issued after the Ninth Circuit affirmed the
21 constitutionality of RLUIPA.   Defendants did not appeal this
22 injunction, but rather, stipulated to the maintenance of the
23 grooming preliminary injunctive relief without the need for
24 successive motions pending their petition for rehearing en banc and
25 their petition for certiorari.  Once the petition for certiorari
26 was denied, they stipulated to allow the grooming relief to

9

1   continue pending final judgment.   As with the Jumu'ah injunction,

2   defendants continue to comply with the grooming injunction at this

3   time.

4                                    **II.**

5           **SUMMARY JUDGMENT STANDARDS UNDER FED. R. CIV. P. 56**

6           Summary judgment is appropriate when it is demonstrated that

7   there exists no genuine issue as to any material fact, and that the

8   moving party is entitled to judgment as a matter of law.   Fed. R.

9   Civ. P. 56(c); <u>See also</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144,

10  157 (1970); <u>Secor Limited v. Cetus Corp.</u>, 51 F.3d 848, 853 (9th

11  Cir. 1995).

12          Under summary judgment practice, the moving party

13                  always bears the initial responsibility of
                    informing the district court of the basis
14                  for its motion, and identifying those
                    portions of "the pleadings, depositions,
15                  answers to interrogatories, and admissions
                    on file, together with the affidavits, if
16                  any," which it believes demonstrate the
                    absence of a genuine issue of material fact.
17

18  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).   "[W]here the

19  nonmoving party will bear the burden of proof at trial on a

20  dispositive issue, a summary judgment motion may properly be made

21  in reliance solely on the 'pleadings, depositions, answers to

22  interrogatories, and admissions on file.'"   <u>Id.</u>   Indeed, summary

23  judgment should be entered, after adequate time for discovery and

24  upon motion, against a party who fails to make a showing sufficient

25  to establish the existence of an element essential to that party's

26  case, and on which that party will bear the burden of proof at

1  trial.  See id. at 322.  "[A] complete failure of proof concerning

2  an essential element of the nonmoving party's case necessarily

3  renders all other facts immaterial."  Id.  In such a circumstance,

4  summary judgment should be granted, "so long as whatever is before

5  the district court demonstrates that the standard for entry of

6  summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

7  at 323.

8      If the moving party meets its initial responsibility, the

9  burden then shifts to the opposing party to establish that a

10 genuine issue as to any material fact actually does exist.

11 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

12 586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

13 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

14     In attempting to establish the existence of this factual

15 dispute, the opposing party may not rely upon the denials of its

16 pleadings, but is required to tender evidence of specific facts in

17 the form of affidavits, and/or admissible discovery material, in

18 support of its contention that the dispute exists.  See Fed. R.

19 Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First

20 Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954

21 (9th Cir. 1998).  The opposing party must demonstrate that the fact

22 in contention is material, i.e., a fact that might affect the

23 outcome of the suit under the governing law, Anderson v. Liberty

24 Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169,

25 Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th

26 Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec.

11

1  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

2  dispute is genuine, i.e., the evidence is such that a reasonable

3  jury could return a verdict for the nonmoving party, Anderson, 477

4  U.S. 248-49; see also Cline v. Industrial Maintenance Engineering

5  & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

6      In the endeavor to establish the existence of a factual

7  dispute, the opposing party need not establish a material issue of

8  fact conclusively in its favor.  It is sufficient that "the claimed

9  factual dispute be shown to require a jury or judge to resolve the

10 parties' differing versions of the truth at trial."  First Nat'l

11 Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631.

12 Thus, the "purpose of summary judgment is to 'pierce the pleadings

13 and to assess the proof in order to see whether there is a genuine

14 need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R.

15 Civ. P. 56(e) advisory committee's note on 1963 amendments); see

16 also International Union of Bricklayers & Allied Craftsman Local

17 Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.

18 1985).

19     In resolving the summary judgment motion, the court examines

20 the  pleadings,  depositions,  answers  to  interrogatories,  and

21 admissions on file, together with the affidavits, if any.  Rule

22 56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093

23 (9th Cir. 1999).  The evidence of the opposing party is to be

24 believed,  see Anderson, 477 U.S. at 255, and all reasonable

25 inferences that may be drawn from the facts placed before the court

26 must be drawn in favor of the opposing party, see Matsushita, 475

1  U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654,
2  655 (1962)(<u>per curiam</u>)); <u>See also</u> <u>Headwaters Forest Defense v.</u>
3  <u>County of Humboldt</u>, 211 F.3d 1121, 1132 (9th Cir. 2000).
4  Nevertheless, inferences are not drawn out of the air, and it is
5  the opposing party's obligation to produce a factual predicate from
6  which the inference may be drawn.  <u>See</u> <u>Richards v. Nielsen Freight</u>
7  <u>Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d
8  898, 902 (9th Cir. 1987).

9      Finally, to demonstrate a genuine issue, the opposing party
10 "must do more than simply show that there is some metaphysical
11 doubt as to the material facts. . . . Where the record taken as a
12 whole could not lead a rational trier of fact to find for the
13 nonmoving party, there is no 'genuine issue for trial.'"
14 <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

15                               **III.**

16                        **RLUIPA STANDARDS**

17     RLUIPA provides that "[n]o government shall impose a
18 substantial burden on the religious exercise of a person residing
19 in or confined to an institution . . . even if the burden results
20 from a rule of general applicability, unless the government
21 demonstrates that imposition of the burden on that person . . . is
22 in furtherance of a compelling governmental interest [] and . . .
23 is the least restrictive means of furthering that compelling
24 interest."  42 U.S.C. § 2000cc-1(a).  The Act applies to any
25 "program or activity that receives Federal financial assistance."
26 42 U.S.C. § 2000cc-1(b)(1) and (2).

To assert a claim under RLUIPA, plaintiffs must produce "prima facie evidence to support a claim alleging a violation of the Free Exercise Clause . . . ." 42 U.S.C. § 2000cc-2(b). The government, however, "shall bear the burden of persuasion on any element of the claim, except that plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b).

RLUIPA further provides that it shall be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

In opposing plaintiffs' motion for a permanent injunction, defendants make a series of arguments that have consistently been rejected during the course of this litigation. Indeed, each of defendants' contentions are effectively foreclosed by law of the case, either because of a previous ruling of this court, or the Ninth Circuit, or both. Additionally, this court's recent decision on permanent injunctive relief in Fenelon v. Riddle, No. CIV-S-95-0954 LKK JFM, is virtually indistinguishable from the Jumu'ah claim at issue here.

As I explain below, defendants do make one new argument, and it is a serious one. Defendants contend that this court cannot grant injunctive relief which would expunge from plaintiffs' files any rules violation reports for attending Jumu'ah or failure to comply with grooming regulations. They argue that such relief,

14

1  because it involves relief that would affect the length of
2  plaintiffs' sentence, can only be resolved through a writ of habeas
3  corpus.  Before addressing this argument, I briefly touch on
4  defendants' other contentions.

5                                IV.

6            **STANDING/ADEQUACY OF CLASS REPRESENTATIVES**

7       First, defendants contend that the named class representatives
8  may not seek injunctive relief because they have not demonstrated
9  a substantial burden on their religious exercise insofar as they
10 have not been disciplined for failure to comply with the challenged
11 policies.  Defendants' argument, through couched by defendants in
12 terms of the RLUIPA "substantial burden" requirement, is in effect
13 an attack on plaintiffs' standing to bring their claims.  This
14 court, however, has already addressed nearly identical arguments
15 concerning the same named plaintiffs and has rejected them.  See
16 Order of March 30, 2001 at 6.  As the court has previously
17 explained, defendants' argument speaks to the effectiveness of the
18 court's preliminary injunction, not the justiciability of the
19 plaintiffs' claim.  See Friends of Earth, Inc. v. Laidlaw
20 Environmental Services, Inc., 528 U.S. 167, 190 (2000)("[I]t is
21 plaintiffs' burden to establish standing by demonstrating that, if
22 unchecked by the litigation, the defendant's allegedly wrong
23 behavior will likely occur or continue and that the threatened
24 injury is certainly impending.")(citations and internal quotation
25 marks omitted).  Plaintiffs' uncontested proffer that they had been
26 prevented from attending Jumu'ah prior to the issuance of the

                                 15

1  injunction suffices to establish their standing.  The mere fact
2  that the substituted class representatives, who were added as
3  representatives after preliminary injunctive relief had been
4  granted, have not been disciplined, does not suggest that they are
5  inadequate as representatives.  As the Ninth Circuit recently
6  explained:

> The named plaintiffs either face or have faced the
> choice between following work incentive program rules
> and obeying the Qur'an.  Prison officials do not argue
> that the named plaintiffs are somehow immune from having
> to work on Fridays in the future.  The prisoners have
> standing to seek injunctive relief, and a holding to the
> contrary would allow prison officials to defeat
> prisoners' claims simply by changing individual
> plaintiffs' work schedules as soon as they file suit.

12  Mayweathers v. Newland, 258 F.3d 930, 934-935 (9th Cir. 2001).  The
13  same logic addresses defendants' contention regarding discipline
14  under the grooming regulations.  As plaintiffs' reply brief
15  explains in detail, the court has already found all three class
16  representatives adequate to challenge both the grooming and Jumu'ah
17  policies, and defendants do not allege any permanent change in
18  circumstances which would alter that conclusion.

19                                V.

20              COMPELLING INTEREST/LEAST RESTRICTIVE MEANS

21      Defendants next raise a series of arguments seeking to justify
22  the Jumu'ah and grooming policies as serving compelling interests
23  such as security within the prison.  Again, as plaintiffs point
24  out, both this court and the Ninth Circuit have foreclosed
25  precisely the same arguments.  For purposes of the record on
26  appeal, the court will once again briefly explain why defendants'

                                16

1 arguments are not persuasive.

2 **A.    GROOMING POLICY**

3      Plaintiffs assert that their religion requires that they wear
4 beards.   It is uncontested that inmates who refuse to shave their
5 beards in conformity with CDC grooming regulations are subjected
6 to progressive penalties, culminating in placement on "C-Status,"
7 which prevents inmates from earning good-time credits.  <u>See</u> Cal.
8 Code Regs., tit. 15, §§ 3062(m) & 3315(f).

9      Defendants assert that the grooming regulations are necessary
10 to identify inmates for the purpose of preventing escapes and
11 controlling movement within the prison.   They have previously
12 tendered evidence that the grooming regulations were implemented
13 in response to a number of escapes from different institutions
14 after inmates altered their appearances.  <u>See</u> Anthony Newland Depo.
15 at 39:15-40:13; 62:13-65:3; 64:6-65:3. Defendants also submit that
16 a beard of any length changes the appearance of a prisoner and
17 compromises the process of identifying inmates or escapees.
18 Finally, defendants assert that correctional officers need to
19 quickly identify inmates to prevent assaults, riots, or
20 disturbances, and that without these amended regulations this
21 process would become impossible if an inmate quickly changed his
22 appearance by shaving his beard.

23      Throughout the course of this litigation, plaintiffs have
24 responded to these arguments with evidence that the safety and
25 security concerns tendered by defendants are largely exaggerated,
26 and do not justify the imposition of grooming regulations

1  prohibiting beards.  Plaintiffs' expert, George Sullivan, who has

2  more than forty years of experience in corrections, stated in his

3  affidavit that he was unaware of any instance where an inmate

4  escaped from prison solely by changing his appearance.  See George

5  Sullivan Dec. at ¶¶ 3, 12.  Sullivan opined that the incidents of

6  escape cited by CDC officials were taken out of context, without

7  acknowledgment of the additional circumstances that permitted each

8  escape.  Id.  Moreover, Sullivan averred that Section 3287(b) of

9  the grooming regulation should alleviate defendants' concerns about

10  identification since it requires "visual daily inspections . . .

11  to ensure compliance with departmental grooming standards."  See

12  George Sullivan Decl. at 13 (citing Cal. Code. Regs., tit. 15,

13  § 3287(b)).

14      Defendants' rationale that an inmate with a beard can more

15  easily alter his appearance after he escapes is not persuasive.

16  Common sense and experience recognizes that a prisoner may not only

17  shave, but alter his appearance in any number of ways to evade

18  authorities after escape.  Moreover, while it is plausible that

19  altering a six inch beard, or cutting very long hair may assist an

20  escapee to elude capture, I must agree with Judge Strand that

21  shaving a half-inch beard likely cannot.  See Luckette v. Lewis,

22  883 F. Supp. 471, 481 (D. Ariz. 1995)("prison officials do not meet

23  their burden of demonstrating a compelling interest for not

24  allowing a short, kempt beard"); Fromer v. Scully, 874 F.2d 69, 74

25  (2d Cir. 1989)("[i]t is certainly not irrational to believe that

26  a full beard, which may well extend for significant lengths

18

1  sideways from the cheeks as well as downwards from the chin, may
2  impede identification more than a one-inch beard"). As Magistrate
3  Judge Moulds concluded "[w]hen it comes to changing one's
4  appearance through the growth or removal of hair, this court finds
5  that not all beards are equal." See Findings and Recommendations,
6  dated March 29, 2000, at 30:10-12.

7      Finally, I note that the defendants are not faced with the
8  specter of prisoners constantly changing their appearance. Surely
9  an inmate who grows a beard for assertedly religious reasons and
10  then shaves without compulsion, provides evidence suggesting that
11  the inmate does not have a legitimate religious conviction. See
12  Luckette, 883 F.Supp. at 481. For the foregoing reasons, the court
13  concludes that the prison grooming policy does not further a
14  compelling governmental interest, and is therefore in violation of
15  RLUIPA. See 42 U.S.C. § 2000cc-1(a).

16      Because I conclude above that the plaintiffs have made a
17  sufficient showing that the regulations are an exaggerated response
18  to defendants' security concerns, it follows that defendants have
19  not demonstrated that the regulations are the least restrictive
20  means of achieving a compelling governmental interest.

21      As explained above, the grooming regulations themselves
22  provide one alternative. Section 3287(b) of Title 15 of the
23  California Code of Regulations requires mandatory visual daily
24  inspections of inmates' facial hair. These inspections should
25  alleviate concerns about an inmate's ability to engender confusion
26  by radical alterations in appearance. Nor does the concern that

1   escapees may change their appearance require a different result.
2   Prison officials can address the risk of an inmate avoiding
3   detection by shaving his beard by requiring two photographs of that
4   inmate: one with his face clean shaven, and one with a half-inch
5   beard.   Luckette, 883 F.Supp. at 481 (finding that photographing
6   an inmate with a short beard may make it easier to differentiate
7   that inmate from others without beards); see also Ross v. Coughlin,
8   669 F.Supp. 1235, 1240-41 (S.D.N.Y. 1987) (upholding an "initial
9   shave" requirement to obtain a photograph of inmates without a
10  beard to later assist in their identification if they shave their
11  beards).  Indeed, prior to the current grooming regulations, prison
12  officials took additional photos of inmates who altered their
13  appearance during incarceration through the growth of hair.  See
14  Findings and Recommendations, dated March 29, 2000, at 32:1-5.
15  Defendants produce no evidence that resuming this practice would
16  result in a significant cost to the institution.

17      Because there appear to be ready alternatives to the
18  prohibition of beards, defendants have not used the least
19  restrictive means of accomplishing its goals of prison security and
20  easy identification of prisoners.  See Ashelman v. Wawrzaszek, 111
21  F.3d 674, 677 (9th Cir. 1997)("the existence of alternatives may
22  be evidence that the [policy] is not reasonable but is an
23  'exaggerated response' to prison concerns.")

24      For the foregoing reasons, I conclude that the challenged
25  grooming regulations, as they are applied to plaintiffs, violate
26  RLUIPA.

1  **B.    JUMU'AH ATTENDANCE**

2        As with the grooming policy, defendants repeat their

3  previously-rejected arguments with respect to Jumu'ah attendance.

4  They argue that, even if the prison's polices impose a substantial

5  burden on plaintiffs' exercise of religion, the defendants have a

6  compelling interest in administering the Work Incentive Program

7  because the program provides for safety and security in the prisons

8  and prevents prison conditions from deteriorating.  In particular,

9  defendants argue that the WIP program accomplishes these objectives

10  by keeping inmates engaged in productive, supervised activities and

11  providing the prison with labor needed to prevent prison conditions

12  from deteriorating.

13        If this were a traditional Free Exercise Clause challenge, it

14  is doubtful that these asserted justifications would be sufficient

15  to withstand scrutiny under O'Lone and Turner v. Safley, 482 U.S.

16  78 (1987).  See Mayweathers I, 258 F.3d at 937-38 (holding prison

17  policy of punishing inmates for missing work to attend Jumu'ah

18  services was not rationally related to a legitimate penological

19  purpose under Turner); id. at 938. ("As the discussion of the

20  Turner factors shows, the inmates' likelihood of success on the

21  merits is strong.").  Under RLUIPA, however, defendants must meet

22  an even higher standard.  They must conclusively demonstrate that

23  the policy "is in furtherance of a compelling governmental interest

24  [and] is the least restrictive means of furthering that compelling

25  governmental interest." 42 U.S.C. § 2000cc-1(a).

26  ////

1    In <u>Mayweathers I</u>, the Ninth Circuit considered and rejected
2  defendants' argument that the injunction in this case would
3  interfere with the government's interest in making sure that
4  inmates attend their work and education assignments. See <u>id.</u> at
5  938.  Although the court found this to be a "legitimate interest"
6  under <u>Turner</u>, the court ultimately found the justification
7  insufficient because the injunction had not significantly altered
8  the operation of the prison's work program.  The court found that
9  the defendants had:

10         utterly failed to show any ripple effect among inmates
           and staff from the narrow scope of the injunction.
11         Prison administrators have implemented the injunction
           by logging inmates' unexcused absences as always; the
12         only change is that unexcused absences attributable to
           Jumu'ah attendance are off bounds to the disciplinary
13         process . . . [T]he absence of Muslim inmates for
           about one hour on Fridays only will not disrupt the
14         operation of the work incentive program.

15  <u>Id.</u>  Defendants have presented no evidence suggesting that the
16  situation within the prison has changed since the Ninth Circuit
17  handed down its decision.

18    Even assuming that defendants' asserted interests in keeping
19  prisoners occupied and using their labor for prison upkeep were
20  sufficiently compelling, however, defendants have not demonstrated
21  that the challenged policy with respect to Jumu'ah, in particular,
22  is the least restrictive means to achieve those interests.  Among
23  the several reasonable alternatives suggested by plaintiff, the
24  most obvious is the suggestion that the Warden grant a special
25  exemption for attendance at Jumu'ah, such that missing work to
26  attend Jumu'ah will not result in disciplinary action.  Under the

1  current regulations, some inmates may take as many as 16 hours off
2  a month to receive visitors, attend special services, and go to
3  certain recreation and entertainment events.  See Cal. Code Regs.,
4  tit. 15, §§ 3045.2(b) & (e).  Given the extensive set of secular
5  exemptions to the prison work requirements, the policy of punishing
6  inmates for one hour of weekly Jumu'ah attendance cannot be said
7  to be the least restrictive means of achieving the state's asserted
8  interest in instilling work ethic.

9       Finally, the Ninth Circuit's conclusion in Mayweathers I that
10  the preliminary injunctive relief has caused only a "slight change
11  from routine prison practices," id. at 938, cannot be reconciled
12  with the notion that very same relief, if made permanent, would
13  somehow result in serious disruption to the prison.  For the
14  foregoing reasons, the court finds that the prison's policy with
15  respect to Jumu'ah attendance is in violation of RLUIPA.

16                                    **VI.**

17                   **EXPUNGEMENT OF DISCIPLINARY RECORDS**

18       Finally, defendants take issue with the third prong of
19  plaintiffs' proposed injunctive relief, which reads as follows:
20       Defendants shall remove from the custody files of all
         past and current members of the plaintiff class, any
21       and all documents reflecting disciplinary action or
         credit loss resulting from plaintiffs' attendance at
22       Jumu'ah or from wearing beards for religious purposes.
23  Defendants take issue with this proposed relief on two grounds.
24  First, they argue that the proposed injunction would violate the
25  PLRA's standards for permanent injunctive relief.  Second, they
26  argue that the injunction would violate the rule of Heck v.

                                    23

1  Humphrey, 512 U.S. 477, 487 (1994), because it would have the
2  effect of reducing the length of plaintiffs' sentences to the
3  extent that the discipline in question involved the loss of
4  credits.  I address these arguments in turn.

5      The court may not grant prospective relief without making the
6  specific findings required by the Prison Litigation Reform Act
7  (PLRA).  See 18 U.S.C. § 3626(a)(1).  The PLRA provides that "[t]he
8  court shall not grant or approve any prospective relief [with
9  respect to prison conditions] unless the court finds that such
10 relief is narrowly drawn, extends no further than necessary to
11 correct the violation of the Federal right, and is the least
12 intrusive means necessary to correct the violation of the Federal
13 right."  Id.; see also Oluwa v. Gomez, 133 F.3d 1237, 1239 (9th Cir.
14 1998) ("We interpret the statute to mean just what is says – before
15 granting prospective injunctive relief, the trial court must make
16 the findings mandated by the PLRA.").

17     Under these standards, defendants raise two objections to the
18 request.  First, they argue that they are "not required to expunge
19 all disciplinary actions that occurred prior to the Court issuing
20 Plaintiffs preliminary injunctive relief and prior to RLUIPA."
21 Second, they argue that "there is no method by which Defendants can
22 identify all the past and current members of the Plaintiff class
23 to determine which records need to be expunged."  Def's Oppo. at
24 13.
25 ////
26 ////

1 **A.    RETROACTIVE APPLICATION**

2       With respect to retroactive effect, the statute is silent.

3 Orafan v. Goord, 2003 WL 21972735 (N.D.N.Y. Aug 11, 2003) ("Unlike

4 its predecessor, RLUIPA is silent as to its retroactive

5 applicability."). In Landgraf v. USI Film Products, 511 U.S. 244

6 (1994), the Supreme Court explained the approach courts should

7 follow when determining the temporal application of new

8 legislation. First, courts must begin with the statutory language

9 to ascertain whether Congress prescribed the statute's temporal

10 reach. Id. at 280. If the statute is silent on such issue, as it

11 is here, the court must then determine "whether the new statute

12 would have retroactive effect, i.e., whether it would impair rights

13 a party possessed when he acted, increase a party's liability for

14 past conduct, or impose new duties with respect to transactions

15 already completed." Id. (quoted in St. Cyr v. I.N.S., 229 F.3d

16 406, 413 (2d Cir. 2000)). If application of the statute would have

17 such a "retroactive effect," "then, in keeping with our

18 'traditional presumption' against retroactivity, we presume that

19 the statute does not apply to that conduct." Martin v. Hadix, 527

20 U.S. 343, 352 (1999) (quoting Landgraf, 511 U.S. at 280); see also

21 Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) (judicial

22 default rules dictate, absent statutory language or other

23 legislative intent to the contrary retroactivity is not favored in

24 the law) (cited in Landgraf, 511 U.S. at 264); St. Cyr v. I.N.S.,

25 229 F.3d at 413; Mojica v. Reno, 970 F.Supp. 130, 168 (E.D.N.Y.

26 1997).

1    Applying these standards to RLUIPA, it is apparent that the
2  statute is silent as to its temporal application and further,
3  applying the statute retroactively would appear to attach new legal
4  consequences with respect to past conduct.   Pre-RLUIPA monetary
5  damages, for instance, would clearly be precluded.   It is less
6  clear that these rules affect a request for injunctive relief,
7  since the function of injunctive relief is directed to the future
8  and not toward remediation of past wrongs. See Landgraf, 511 U.S.
9  at 293 (Scalia, J. concurring).   For these reasons, prospective
10 injunctive relief is ordinarily not considered retroactive, and
11 courts have so held in the context of RLUIPA. See Kikumura v.
12 Hurley, 242 F.3d 950, 960 n. 5 (10th Cir. 2001)(holding that the
13 application of RLUIPA was not retroactive where the plaintiffs
14 sought injunctive relief); Dilaura v. Ann Arbor Charter Twp., 30
15 Fed.Appx. 501, 509 (6th Cir. 2002) ("Plaintiffs are seeking
16 prospective relief [under RLUIPA] in the form of an injunction
17 ordering the township to allow them to run their retreat house.
18 Injunctive relief is prospective, not retroactive.").   Here,
19 however, the requested relief is intended not merely to
20 prospectively bar defendants from violating plaintiffs' rights, but
21 also to remedy past violations of plaintiffs' rights.

22    With respect to the beard policy, it can be said with
23 confidence that relief would not have been available prior to the
24 enactment of RLUIPA, since this court denied injunctive relief on
25 that basis under the pre-RLUIPA Turner standard.   With respect to
26 the Jumu'ah policy, however, this court (and the Ninth Circuit)

1   have already found that injunctive relief would be proper under the
2   <u>Turner</u> standard as well.  Thus, at least as to that issue, relief
3   for wrongs predating RLUIPA would appear appropriate regardless of
4   whether the statute has retroactive effect.  This creates two
5   regimes for disciplinary actions predating 2000: disciplinary
6   actions due to Jumu'ah attendance are invalid, while disciplinary
7   action due to contravention of the beards rule are not.

8   **B.   ADMINISTRATIVE BURDEN**

9       Defendants also raise a serious argument that it would be
10   either difficult or impossible for them to locate all past and
11   current members of the plaintiff class to determine which records
12   need to be expunged.  Unfortunately, defendants provide no evidence
13   of any asserted administrative burden apart from the bald
14   suggestion that it would be difficult to locate members of the
15   plaintiff class, making it difficult for the court to devise an
16   appropriate remedy that respects both the needs of the prison
17   administrators and those of the plaintiffs.

18       Under the PLRA, the court must specifically find that the
19   relief afforded extends no further than necessary to correct the
20   threat to plaintiffs' rights under RLUIPA and, accordingly, that
21   it is narrowly drawn and the least intrusive means necessary to
22   correct the harm.  Accordingly, the court will order the parties
23   to propose an appropriate means of implementing the expungement of
24   plaintiffs' disciplinary records.

25   ////

26   ////

27

1                                    VII.

2                        **HABEAS EXHAUSTION RULE**

3          Finally, defendants object to the disciplinary expungement

4    relief on the grounds that the proposed injunction, to the extent

5    that it concerns the loss of credits that would affect the length

6    of plaintiffs' sentences, may be accomplished only through a writ

7    of habeas corpus.  Defendants rely on <u>Heck v. Humphrey</u>, 512 U.S.

8    477 (1994), and its predecessor case, <u>Preiser v. Rodriguez</u>, 411

9    U.S. 475 (1973), in which the Supreme Court addressed the

10   relationship between 42 U.S.C. § 1983 and the habeas statutes,

11   28 U.S.C. §§ 2241 and 2254.  <u>Preiser</u>, 411 U.S. at 482; <u>Heck</u>, 512

12   U.S. at 480 ("This case lies at the intersection of two of the most

13   fertile sources of federal-court prisoner litigation [§ 1983] and

14   [the federal habeas corpus statutes]").  No court has yet

15   considered the application of the <u>Heck</u>-<u>Preiser</u> rule to RLUIPA.

16   **A.    Preiser v. Rodriguez**

17         In <u>Preiser</u>, the plaintiffs were state prisoners who were

18   deprived of good-time credits as a result of disciplinary

19   proceedings and who brought suit under section 1983 alleging that

20   prison officials had acted unconstitutionally in depriving them of

21   the credits.  411 U.S. at 476.  The Court considered the potential

22   overlap between section 1983 and the habeas statutes in such cases

23   and held that habeas corpus provided the exclusive remedy for a

24   state prisoner who challenged the fact or duration of his

25   confinement and sought immediate or speedier release, even though

26   his claim may otherwise come within the literal terms of § 1983.

1     The Preiser Court rejected the prisoners' claim that the broad
2  language of section 1983, which concededly encompassed their
3  claims, should decide the issue:

4          The broad language of § 1983, however, is not
           conclusive of the issue before us.  The statute is a
5          general one, and, despite the literal applicability of
           its terms, the question remains whether the specific
6          federal habeas corpus statute, explicitly and
           historically designed to provide the means for a state
7          prisoner to attack the validity of his confinement,
           must be understood to be the exclusive remedy
8          available in a situation like this where it so clearly
           applies.
9

10 411 U.S. at 489.   Thus, the Court's reasoning hinged on the
11 distinction between the generality of section 1983 and the
12 specificity of the federal habeas statutes in addressing a means
13 for attacking the validity of confinement.

14     Next, the Court observed that, in amending the habeas corpus
15 law in 1948, Congress had imposed a requirement that prisoners
16 exhaust all adequate state remedies as a precondition to invoking
17 federal judicial relief.   "It would wholly frustrate explicit
18 congressional intent," the Court explained, "to hold that the
19 respondents in the present case could evade this requirement by the
20 simple expedient of putting a different label on their pleadings.
21 In short, Congress has determined that habeas corpus is the
22 appropriate remedy for state prisoners attacking the validity of
23 the fact or length of their confinement, and that specific
24 determination must override the general terms of § 1983." Id. at
25 489-90.   Again, the court's reasoning relied on the
26 distinction between the specific requirement of habeas exhaustion

1   taking precedence over section 1983's general terms.  <u>See</u> 411 U.S.
2   at 489 ("It was conceded [at oral argument] that [a state prisoner]
3   cannot bring a § 1983 action, even though the literal terms of
4   § 1983 might seem to cover such a challenge, *because Congress has*
5   *passed a more specific act to cover that situation*, and, in doing
6   so, has provided that a state prisoner challenging his conviction
7   must first seek relief in a state forum, if a state remedy is
8   available." (emphasis added)).

9        Finally, the Court explained that policy considerations,
10  particularly the need for federal-state comity in a situation in
11  which federal courts are asked to review the actions of state
12  officials and state courts, furthered the need to give full effect
13  to the exhaustion requirement. <u>Id.</u> at 491-497.

14  **B.    Heck v. Humphrey**

15       In <u>Heck</u>, the Court revisited the same territory, addressing
16  "the question whether a state prisoner may challenge the
17  constitutionality of his conviction in a suit for damages under 42
18  U.S.C. § 1983." 481 U.S. at 478.     That question, the Court
19  maintained, was "clearly not covered by the holding of <u>Preiser</u>, for
20  petitioner seeks not immediate or speedier release, but monetary
21  damages, as to which he could not have sought and obtained fully
22  effective relief through federal habeas corpus proceedings." <u>Id.</u>
23  at 481.   <u>Heck</u> reaffirmed the rule of <u>Preiser</u> and extended it even
24  to claims for which habeas cannot provide relief, but which
25  nevertheless call into question the validity of a conviction.
26  ////

1    The starting point of <u>Heck</u> was the well-established principle
2    that section 1983 "creates a species of tort liability," <u>Id.</u> at 483
3    (<u>citing</u> <u>Memphis Community Sch. Dist v. Stachura</u>, 4722 U.S. 299, 305
4    (1986)), and that the common law of torts provides rules regarding
5    the "elements of damages and the prerequisites for their recovery"
6    which provide a backdrop for 1983 actions.  "Thus," the Court
7    explained, "to determine whether there is any bar to the present
8    suit, we look first to the common law of torts." <u>Id.</u> at 483.  The
9    Court then analogized the sort of section 1983 claim involved to
10   a malicious prosecution claim, which, at common law, required the
11   plaintiff to establish as an element of the tort that the prior
12   criminal proceeding terminated in favor of the accused.  This
13   requirement avoids parallel litigation over the same issues and
14   prevents a criminal defendant from making a collateral attack on
15   his or her conviction through a civil suit.  Reasoning that the
16   same need for finality and consistency inheres in civil rights
17   suits, the Court concluded that the final termination requirement
18   was equally applicable to section 1983 actions.  <u>Id.</u> at 484 ("We
19   think the hoary principle that civil tort actions are not
20   appropriate vehicles for challenging the validity of outstanding
21   criminal judgments applies to § 1983 damages actions that
22   necessarily require the plaintiff to prove the unlawfulness of his
23   conviction or confinement, just as it has always applied to actions
24   for malicious prosecution.").
25   ////
26   ////

1   **C.    APPLICATION OF PREISER-HECK RULE TO RLUIPA**

2        The court must consider what bearing the holdings of Preiser
3   and Heck, both developed in connection with the interaction between
4   section 1983 and habeas corpus, have in the context of an action
5   alleging violations of RLUIPA, the correction of which may impact
6   the length or duration of a plaintiff's confinement.  As I now
7   explain, defendants' argument that Heck bars the relief sought
8   fails because of crucial differences between RLUIPA and section
9   1983.

10       First, plaintiffs' suit is brought under a specific
11  Congressional enactment, RLUIPA, designed to redress the harms that
12  result  from  preventing  prison  inmates  from  exercising  their
13  religion.  The statute's legislative history indicates that it was
14  enacted  to  prevent  correctional  institutions  from  restricting
15  "religious liberty in egregious and unnecessary ways." 146 Cong.
16  Rec. S7774-01 (July 27, 2000) (Joint Statement of Senators Hatch
17  and Kennedy).  The statute endows federal courts with broad
18  remedial powers to correct such harms, and provides that the "Act
19  shall be construed in favor of a broad protection of religious
20  exercise, to the maximum extent permitted by the terms of this Act
21  and the Constitution." 42 U.S.C. § 2000cc-3(g).

22       As explained above, the dichotomy between the broad sweep of
23  the section 1983 statute and the specific scope of the habeas
24  statutes was central to the Court's reasoning in Preiser.  Preiser
25  held that the specific remedy of habeas corpus was the appropriate
26  vehicle  for  attacking  the  validity  of  the  fact  or  length  of

confinement and that "that specific determination must override the general terms of § 1983." 411 U.S. at 490.  Here, however, the situation is reversed: RLUIPA addresses a much more specific problem than the habeas statutes and, within that specific area, erects no exhaustion barrier and gives courts the power to remedy wrongs.

Second, to the extent that both <u>Preiser</u> and <u>Heck</u> are based on a comparison between habeas and the general tort regime of section 1983, the comparison is inapplicable here.  In particular, <u>Heck</u>'s analogy between section 1983 actions and common law malicious prosecution claims simply has nothing to do with a claim under a specific modern civil rights statute designed to apply in the prison context.  This fact alone makes clear that <u>Heck</u> is irrelevant to today's decision.

Finally, had Congress intended for habeas exhaustion requirements to limit relief under RLUIPA, Congress could surely have so indicated.  The federal courts need not import such a requirement and, indeed, must especially decline to do so given RLUIPA's command that the Act "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the Constitution."  42 U.S.C. § 2000cc-3(g).  Confronted with the choice between a specific Congressional enactment and a judge-made rule that might be read to conflict with the statute, a federal court is bound to follow the clear intent of Congress.  <u>See</u> <u>Nev. Dep't of Human Resources v. Hibbs</u>, 538 U.S. 721, 123 S.Ct. 1972, 1977 (2003).  Indeed, in

33

1  the context of religious exercise, the Court has invited the

2  political branches to provide greater protection for religious

3  exercise through legislation.  See <u>Employment Division v. Smith</u>,

4  494 U.S. 872, 890 (1990); <u>Madison v. Riter</u>, 355 F.3d 310, 314-15

5  (4th Cir. 2003).  As Senator Kennedy, one of RLUIPA's sponsors,

6  explained, RLUIPA "reflects our commitment to protect religious

7  freedom and our belief that Congress still has the power to enact

8  legislation to enhance that freedom, even after the Supreme Court's

9  decision in 1997 that struck down the broader [RFRA]." 146 Cong.

10  Rec. S7774-01 (July 27, 2000).

11      <u>Heck</u>, <u>Preiser</u>, and their progeny, therefore, do not preclude

12  the relief requested by plaintiffs here.

13                              **VIII.**

14                           **CONCLUSION**

15      For the foregoing reasons, the court hereby ORDERS as follows:

16      1.  Plaintiffs' motion for summary judgment and permanent

17  injunction is GRANTED.

18      2.  Defendants are PERMANENTLY ENJOINED as follows:

19      a.  Defendants may not impose any form of discipline on the

20  plaintiffs, or cause them to forfeit or be denied the opportunity

21  to earn sentence-reducing credits, based on plaintiffs' attendance

22  at Jumu'ah services.

23      b.  Defendants may not impose any form of discipline on

24  plaintiffs for wearing half-inch beards for religious purposes.

25      3.  The court specifically finds that foregoing the relief

26  afforded extends no further than necessary to correct the threat

                              34

1 | to plaintiffs' rights under RLUIPA and, accordingly, that it is
2 | narrowly drawn and the least intrusive means necessary to correct
3 | the harm.  <u>See</u> 18 U.S.C. § 3626(a)(1).

4 |     4.    The parties are ORDERED to MEET AND CONFER concerning the
5 | appropriate means of locating and expunging plaintiffs'
6 | disciplinary records in accordance with the principles outlined in
7 | this order and consistent with 18 U.S.C. § 3626(a)(1).  The parties
8 | SHALL FILE a joint proposed order addressing this issue not later
9 | than thirty (30) days from the effective date of this order.
10 | Should the parties fail to reach agreement on the matter, the
11 | parties SHALL FILE separate proposed orders not later than thirty
12 | (30) days from the effective date of this order.

13 |     IT IS SO ORDERED.

14 |     DATED:   June 23, 2004.

16 | LAWRENCE K. KARLTON
17 | SENIOR JUDGE
    UNITED STATES DISTRICT COURT

United States District Court
for the
Eastern District of California
June 25, 2004


* * CERTIFICATE OF SERVICE * *


2:96-cv-01582


Mayweathers

     v.

Sutton


_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  June 25, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


          Susan Dee Christian          AR/LKK
          Prison Law Office
          General Delivery             CF/JFM
          San Quentin, CA  94964

          Karluk M Mayweathers
          D328-29
          Calipatria State Prison
          PO Box 5002
          Calipatria, CA  92233

          Tami M Warwick
          Attorney General's Office for the State of California
          PO Box 944255
          1300 I Street
          Suite 125
          Sacramento, CA  94244-2550

          John K Vincent
          United States Attorney
          501 I Street
          Suite 10-100
          Sacramento, CA  95814

          Marc D Stern
          NOT EDCA ADMITTED

American Jewish Congress
15 East 84th Street
New York, NY  10028

Jack L. Wagner, Clerk

BY: _____
    Deputy Clerk